## ALLEN *v.* NOTHERN.

### Opinion delivered November 15, 1915.

1.   SALES—SALE OF HAY—COMMERCIAL TERM—ORAL EVIDENCE—TESTIMONY TO EXPLAIN.—Defendant agreed to sell certain hay to plaintiff, stating that the same was of "good quality," *held*, under the facts, that the parties used the term "good quality" in its ordinary sense, and that oral testimony to explain its commercial meaning in the place of the residence of the buyer was inadmissible.

2.   CONTRACTS—SALES—MEETING OF MINDS.—Appellee offered to purchase certain hay from appellant, and certain correspondence took place relative thereto.   *Held*, there was never a meeting of the minds of the parties shown by the correspondence as to the quality of the hay, and time of shipment, and that no contract was ever entered into.   *Held*, also, that it would not be held as a matter of law that the contract became binding, although appellee ordered out some of the hay from appellant's manager, thinking the contract had become binding, and while appellant's manager shipped the same without knowledge or authority from appellant.

3.   CONTRACT—SALE OF HAY—MEASURE OF DAMAGES.—The measure of damages for the breach of a contract for the sale of hay is the difference between the contract price of the hay, and the price at the point of delivery, or the nearest available market, if no market exists at the point of delivery.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks*, Judge; reversed.

### STATEMENT BY THE COURT.

W. C. Nothern sued A. M. Allen to recover damages for an alleged breach of contract for the sale of hay.   The defendant denied that any binding contract for the sale of hay had been entered into between the parties.

W. C. Nothern testified for himself substantially as follows: I am engaged in the brokerage business in the city of Little Rock; some time in the first part of December, 1911, A. M. Allen came to my office on other business and while there happened to state that he had a large amount of hay on his ranch in Nebraska which he wished to sell. I asked Allen about the quality of the hay and he replied that he did not know what the quality was. I told him there was a good market for choice, No. 1 alfalfa hay, and asked him how much he had. He replied that he did not know, but thought he had fifteen hundred or two thousand tons. We looked up the freight rate from Cozad, Nebraska, to Little Rock, Arkansas, and I agreed to pay Allen $11 per ton f. o. b. Cozad, Nebraska, for alfalfa hay which would grade No. 1. A car of hay will contain about fifteen tons, and Allen shipped me a car of hay, and when it was inspected it graded No. 1. I then entered into further negotiations with Allen for the purchase of his entire output of hay; he told me that he did not know how much he had but would ascertain the amount, and stated that the quality was as good as that which had been shipped. I told him I would give him $11 per ton for alfalfa grade No. 1 and $12 per ton for choice alfalfa f. o. b. Cozad, Nebraska, this being Allen's shipping point. Allen left Little Rock for Kennett, Missouri, on business and from that place on January 9, 1912, wrote me the following letter:

"Gentlemen: I have received the following telegram from my manager at the ranch, Mr. J. S. Good: 'Have six hundred tons first and second cutting, good quality, four hundred tons third cutting containing a little grass, good quality, one hundred tons fourth cutting, very choice. Extreme cold weather stopped bailing; load Tuesday if weather permits.'

"Confirming our conversation of the 7th inst., will sell you my entire stock on hand on basis of $11 per ton f. o. b. Cozad, Neb., and $12 for all hay of these shipments that, according to official inspection, will meet that price, leaving this matter in your hands to give me a fair deal in this matter of grading.

"Send all your shipping orders to Mr. J. S. Good, Cozad, Neb. The only stipulation I will make is that you order this hay out before my spring work begins on the ranch. We generally commence work in our fields for the new crop during the month of March.

"Please write me on receipt of this at Camilla, Ga., care F. S. Perry, acknowledging receipt of this and your acceptance of this proposition.

"Should you wish the hay faster than one car per day, please indicate this to Mr. Good and he will start two balers.

"Yours truly,<br>
"A. M. Allen."

Allen was a traveling man, and on the 11th day of January, 1912, I wrote him at Camilla, Georgia, as follows:

"I am in receipt of your favor of the 9th, and note fully what you write about the alfalfa hay you have to offer. In reply, will say I think I will be able to handle the whole lot by the first of March, but would like to have a little more time to work on the deal. The price for No. 1 grade is $11 f. o. b. Cozad and $12 for choice, to grade this officially here is all right, but I will ask that you please instruct Mr. Good to not ship anything he doesn't think will grade No. 1 or better. I have instructed him to ship me two cars per day until I further notify him, and as per your instructions will forward all correspondence regarding shipments to him. I have a letter from him today stating that he can only ship a car every other day with the one baler. By this means you will note it will take some time to get the hay moving. If I had five or ten cars No. 1 or better *en route* or here on the track I could turn it right away, but it is hard to sell hay for shipment that far away. In regard to the grading here, will say I have nothing to do with it, as we have two official Board of Trade graders, and when the hay comes in we simply ask them to grade it and pay them sixty cents per car for their grade as per the rules, and all shippers get the same deal. The hay is also sold on

the same terms and the grade is what we base prices and sales. So you can see why I want to work on the grade proposition, which is the system here. You might keep me advised from time to time where you are and your address and I will let you know how I am getting along. I believe it would be a good idea to secure for Mr. Good another baler for at least a while so he can get several cars *en route* without any delay; in fact, he says it will take another baler in order for him to get the hay forward by spring  Hoping to hear from you occasionally, I am.''

I received about three hundred tons of hay from Allen, some of which did not near come up to grade of No. 1. Allen's ranch manager then refused to ship me more.

Nothern then went on to state in detail the amount of damages suffered by him, but this it is not necessary to abstract. Other evidence was also introduced by him tending to corroborate his testimony.

A. M. Allen testified for himself substantially as follows:

I am a traveling salesman with headquarters in Little Rock; I entered into negotiations with the plaintiff for the sale of my output of hay to him in December, 1911; I did not know what my hay would grade as I have never examined it closely; I had only walked over the ranch and counted the stacks; the stacks were fifteen or sixteen feet high and the quality of the hay would depend a good deal upon whether the stacks were well proportioned or not; if the stacks were not built in the proper manner water would leak through and injure the hay; I told Nothern in all our conversations that I did not know what amount of hay I had on my ranch in Nebraska and did not know how it would grade; I told him that my ranch manager could not read nor write and that I was selling my hay through an agent in the town nearest my ranch; I told him that I would ship my hay to him and leave the grading of it to him. I never agreed to sell him any stated number of cars nor any hay of any particular grade; I did not receive the letter of January 11 sent to

me at Camilla, Georgia, in response to my letter of the 9th inst. from Kennett, Missouri, until my return to Little Rock about the 27th or 28th of January, 1912; I called Mr. Nothern up by telephone as soon as I got his letter and told him that his letter was not what we had agreed upon and he replied that his partner had written the letter and had understood it a little different but that he and I understood the matter and there would be no trouble about it.

Evidence was introduced by Allen tending to corroborate his statement to the effect that he had always told Nothern that he did not know what his hay would grade and did not know what amount of good hay there was for shipment on his ranch.

The plaintiff was recalled and denied *in toto* the statements attributed to him by Allen over the telephone and denied positively that Allen had called him up about the 27th or 28th of January, 1912, and told him that the letter of the 11th did not correctly state the terms of the agreement between them.

Other evidence will be stated in the opinion. The jury returned a verdict for the plaintiff in the sum of $4,104.72 with interest and from the judgment rendered the defendant has appealed.

*Rose, Hemingway, Cantrell, Loughborough & Miles,* for appellant.

1. There was no meeting of minds on any amount of hay that would grade No. 1. The correspondence did not constitute a contract. 96 Ark. 613; 112 *Id.* 380; 113 S. W. 703; 54 Pac. 101; 56 N. E. 619; 36 S. E. 291; 97 N. Y. Supp. 1048.

2. It was error to permit Daniels to testify as to what "good quality" meant. 105 Ark. 455; 102 *Id.* 428; 88 *Id.* 213; 99 *Id.* 218; 95 *Id.* 131; 94 *Id.* 130.

3. The court erred in admitting testimony as to the market price of hay at Little Rock. 92 Ark. 111; 60 S. W. 1030.

4. There was error in the instructions of the court.

*Terry, Downie & Streepey,* for appellee.

1. The court correctly charged the jury as to what would constitute a contract and as to the necessity of the meeting of the minds of the parties to the terms of such contract. 56 N. E. 619; 101 Mass. 134.

2. The court did not err in permitting Daniels to testify as to what "good quality" meant. 105 Ark. 455; 69 *Id.* 313, 317; 23 How. 63. Technical local or doubtful words may be explained and defined.

3. There was no error in admitting testimony as to the market price of hay in Little Rock. The place of delivery was Little Rock. 40 L. R. A. 534. The title remained in Allen until the hay arrived in Little Rock. Delivery at Cozad was not delivery to Nothern. 111 Ark. 521; 118 Ark. 17; 50 Ark. 20; 79 *Id.* 353; 22 L. R. A. 421; 54 Wis. 619; 66 N. Y. 92. The measure of damages was the difference between the contract price and the market price at the place of delivery. *Ib.;* 35 Cyc. 638; 92 Ark. 111; 29 S. W. 313; 49 Mo. App. 386; Sedg. on Dam. (8 ed.), § 246.

4. There is no error in the instructions. The place of inspection and delivery was Little Rock. 22 N. E. 349. The measure of damage is correctly stated. 58 Am. Dec. 676; 78 Ill. 230; 88 Ark. 557; 92 *Id.* 111; 113 *Id.* 169; 69 *Id.* 219.

5. Substantial justice has been done on the whole record.

HART, J., (after stating the facts). Dan Daniels was inspector of hay for the Little Rock market, and, over the objection of the defendant, was permitted to testify that, in Little Rock, "very choice hay" means strictly choice hay; that in alfalfa hay it would mean that the hay must all be extra good quality in color and in texture and without a mixture of other grasses and must have a fine stem, and that "good quality" would be about No. 1.

He was asked the question, "What would 'good quality' mean?" and answered, "Well, that would be about a No. 1, I should judge. No. 1 alfalfa would be coarser

stem, a dull green in color, but must be sound and pure, not mixed with other grasses.''

The court erred in admitting this testimony. Allen's letter of the 9th of January, 1912, stated that he had just received a telegram from his manager at the ranch in Nebraska, stating that he had a certain number of tons of the first and second cutting, good quality, and of the third cutting containing a little grass, good quality. It will be noted that Allen in his letter is quoting from the telegram from his manager. The telegram and the letter show that the words ''good quality'' are not used in the sense that grade No. 1 is used in the Little Rock market. Daniels testified that alfalfa hay to grade No. 1 must be unmixed with other grasses. The ranch manager in his telegram referred to the third cutting as containing a little grass and still spoke of it as hay of good quality. So far as the record discloses, the ranch manager had never been to Little Rock and knew nothing whatever about the inspection and grading of hay there.

(1) The response of Nothern to this letter shows that he did not understand ''good quality'' to mean grade No. 1, for he is particular to tell Allen to instruct his manager not to ship any hay that will not grade No. 1. Therefore it was the duty of the court to construe the contract and declare its terms and meaning to the jury. *Mann v. Urquhart,* 89 Ark. 239.

We do not think the words were used in any sense other than the ordinary meaning of ''good quality'' and on that account oral testimony was not admissible to explain the meaning of the words used as was the case in *Paepcke-Leicht Lumber Co.* v. *Talley,* 106 Ark. 400.

(2) The law relating to cases of this kind is well stated in *Cage* v. *Black,* 97 Ark. 613. In that case the court said: ''In order to constitute a binding contract of sale, there must be a mutual assent of both parties to the essential terms of the agreement. Mere negotiations between the parties as to the subject-matter or terms of the sale will not be sufficient to make a binding contract. A binding contract of sale may be entered into by letters

and telegrams, and so an acceptance by letter or telegram of an unconditional offer made in the same manner will constitute an obligatory contract. *Emerson* v. *Stevens Grocer Co.,* 95 Ark. 421. The offer of one represents the agreement on his part, and the acceptance of the other represents his agreement; but, before the contract is consummated, each party must agree to the same proposition, and the agreement of both must be mutual to every essential term of the contract. There is no obligation until an offer expressing the terms of the sale has been made and also an acceptance thereof in accordance with such terms." To the same effect see *Porter* v. *Gossell,* 112 Ark. 380.

In the application of the rule it is evident that the letters did not constitute a binding contract between the parties. The letter of January 9, 1912, written by Allen to Nothern, contained a proposal to Nothern to sell him his entire stock of hay upon terms and conditions therein stated and set out. This letter called for an acceptance on the part of the plaintiff of the terms and conditions therein stated. The letter of January 11, 1912, written by the plaintiff, did not contain an unqualified acceptance of the offer of Allen. It contained other terms and conditions than those imposed by Allen in his letter to him. For instance, Allen's letter contained the stipulation that the hay should be moved before the first of March. The letter of Nothern did not accept this condition. He stated that he thought he could comply with that condition but asked for more time. So, in this respect there was no unconditional acceptance of the terms imposed by Allen.

Again, as we have already indicated, Allen proposed to sell Nothern alfalfa hay designated by his ranch foreman as hay of "good quality" and some of it was described as having a little grass in it. Nothern did not accept this proposal, but, to the contrary, told Allen to be careful to see that his ranch foreman did not ship out any hay that would not grade No. 1 and better. So it will be seen that up to this time the correspondence amounts to no more than proposals by the one and coun-

ter proposals by the other. Allen says that he was a traveling man and did not receive the letter of January 11, 1912, until about the 27th or 28th of the month after his return to Little Rock. He stated that he at once called Nothern over the telephone and told him that the letter was different from the proposals he had made him and that he would not accept the contract proposed by Nothern. Nothern denied that Allen called him over the telephone or rejected the terms of his proposal.

It can not be said that Allen, as a matter of law, accepted the terms of the proposals by permitting the hay to be shipped to Nothern. The record shows that the ranch foreman shipped some hay to Nothern in December, 1911; that early in January Nothern wrote to him about further shipments of hay, and so far as the record discloses these shipments were made by the foreman pursuant to the letters written him by Nothern from time to time and not in pursuance of any contract made between Nothern and Allen.

According to the testimony of Allen the record does not show that he knew that his foreman was shipping out hay under the alleged contract between him and Nothern. On the other hand, Nothern introduced testimony tending to show that the hay was shipped out pursuant to the terms of Nothern's letter of January 11.

We do not deem it necessary to set out the instructions of the court. The jury were permitted to find that the letters between the parties constituted a valid and binding contract. This was error. For the reasons already stated, the letters in themselves did not constitute a binding contract between the parties. There was a disputed question of fact as to whether Allen accepted the new terms imposed by Nothern in his letter of January 11, 1912, by not objecting to them, and by allowing hay to be shipped, or whether he objected to them as soon as he received the letter as testified to by himself.

For the errors indicated in the opinion the judgment must be reversed and the cause remanded for a new trial.

OPINION ON REHEARING.

HART, J.   In their brief on rehearing, counsel for appellee insist that the court erred in stating in its original opinion that the jury was permitted to find that the letters between the parties constituted a valid and binding contract.   We have again examined the instructions' but can not agree with counsel.   We are clearly of the opinion that under instruction No. 1 given by the court the jury might find a contract from the letters between the parties.

It is also suggested by counsel that we overlooked instruction No. 6, asked by appellant, but in this they are mistaken.   We carefully considered instruction No. 6, asked by appellant, and are of the opinion that it contained a clear and concise statement of the law as applicable to the facts in this case.   Allen in his letter of January 9, 1912, made a proposal to Nothern.   Nothern replied to that letter by one under date of January 11, 1912.   His reply was not an absolute acceptance of the terms of Allen's letter but imposed new terms and conditions.   There was a disputed question of fact between the parties as to whether or not Allen accepted the new proposal made by Nothern.   This question of fact was properly submitted to the jury in instruction No. 6, as asked by appellant.   The court should have given the instruction as requested but instead modified the instruction in such a way as to confuse and mislead the jury.   If the court had entertained the same view of the law as was entertained by counsel for appellant it would, no doubt, have given the instruction as asked by the appellant and would not have attempted to modify it.

We did not set out the instructions in our former opinion and do not do so now.   We think we have clearly pointed out the issue of fact that is to be submitted to the jury upon a retrial of the case and no useful purpose could be served by setting out the instructions in full in this opinion.

(3)   In view of another trial of the case, we are asked to settle the law as to the measure of damages, and this we now proceed to do.   The measure of damages was

the difference between the contract price of the hay and the price at the point of delivery, or the nearest available market if no market existed at such point. *Kirchman* v. *Tuffli Bros. Pig Iron & Coke Co.*, 92 Ark. 111.

The letters of the parties state that the hay was sold f. o. b. Cozad, Nebraska, and named that place as the point of delivery. Cozad was a small place and the price of hay there was dependent upon the price of hay in Little Rock and other available markets, so that in determining the market value of hay in Cozad it was proper to consider the market price of hay at Little Rock with the freight added. *St. L. S. W. Ry. Co.* v. *Kilberry*, 83 Ark. 87; *Kansas City Southern Ry. Co.* v. *Mabry*, 112 Ark. 110.

The motion for rehearing will be denied.