ENGLES v. BLOCKER.

Opinion delivered February 12, 1917.

1. CONTRACTS—CORRESPONDENCE—DUTY OF COURT.—Where the terms of a contract are evidenced by certain letters exchanged between the parties, it is the duty of the trial court to construe the contract and declare its terms to the jury.

2. CONTRACTS—CONSTRUCTION OF TERMS.—The correspondence between appellant and appellees held to constitute a contract whereby appellant agreed to transfer a certain interest in certain oil leases.

3. TRIAL—INTRODUCTION OF EVIDENCE AFTER CASE IS CLOSED.—The refusal of the trial court to permit defendant to introduce further testimony after the evidence was closed and the witnesses discharged, held within the court's discretion.

4. CONTRACTS—BREACH—DAMAGES.—In an action for breach of a contract to deliver certain leases to plaintiffs, the value of the leases may be proved by testimony showing the amount defendant received for other leases upon similar property.

5. EVIDENCE—CARBON COPY OF LETTER.—In an action for breach of contract, a *carbon copy* of a letter addressed to an adversary in a lawsuit is

admissible in evidence without making any effort to require the adverse party to produce the letter received by him.

6. EVIDENCE—CARBON COPY OF LETTER—PRESUMPTION.—In an action for breach of a contract founded upon correspondence, the carbon copies of letters written by plaintiff to defendant and introduced in evidence by plaintiff, will be presumed to be duplicates of the letters sent to defendant, where defendant admits their receipt but fails to produce the originals.

7. BROKERS—FAILURE TO PAY LICENSE—RECOVERY OF COMMISSION.— A broker may recover commissions earned by him, although he failed to pay a license required by the city, in the absence of a provision in the city ordinance rendering the broker's acts void.

8. CONTRACTS—CORRESPONDENCE—MEETING OF THE MINDS—OFFER AND ACCEPTANCE.—An offer by defendant to give to plaintiffs each a one-third interest in certain leases, held to have been accepted by the plaintiffs, the contract being evidenced by correspondence.

Appeal from Sebastian Circuit Court, Ft. Smith District; *Paul Little*, Judge; affirmed.

*James B. McDonough*, for appellant.

1. The court erred in refusing to reopen the case for additional evidence. 119 Ark. 450; 108 N. E. 757.

2. There was error in admitting copies of letters in evidence. The proper foundation was not laid, nor showing made. 115 Ark. 142; 72 *Id.* 47; 53 S. W. 655; 18 Barb. 530; 76 N. W. 416; 107 *Id.* 299; 81 Am. Dec. 690.

3. The court erred in admitting the testimony of Blocker and others as to what Engles received in stock. It was hearsay.

4. Blocker had no license; it was error to exclude proof to that effect. Contracts of brokers without license are void. 33 Ark. 436; 89 *Id.* 195; 102 *Id.* 200; 36 Iowa 548; 63 N. W. 325; 54 L. R. A. 939.

5. The contract is within the statute of frauds. The letters did not constitute a contract. There was no acceptance—only a counter offer made. 121 Ark. 150; 97 *Id.* 613; 107 *Id.* 629; Kirby's Digest, § 3656. No contract was ever concluded. There is no proof that the leases were of any value whatever.

6. It was error to exclude the evidence of J. H. Keller. Also to exclude the evidence of appellant

that he never agreed to the terms of Blocker's letter. 121 Ark. 150.

7.   The court erred in its instructions.   96 Ark. 206; 93 *Id.* 564; 95 *Id.* 108; 121 *Id.* 150.

*Winchester & Martin*, for appellees.

1.   The letters constituted a contract.

2.   It was within the sound discretion of the court to reopen the cause for additional evidence—no abuse of discretion is shown.   41 Ark. 57; 122 *Id.* 395; 119 *Id.* 152; 99 *Id.* 412; 36 *Id.* 645; 26 *Id.* 501; 25 *Id.* 387; 21 *Id.* 387.   No prejudicial error is shown.   112 Ark. 507.

3.   The proper showing was made that the originals were lost.

4.   There was no error in the rulings of the court as to the admission of testimony.

5.   Blocker was not a real estate broker and no license was necessary.   There was no violation of any city ordinance.   There was no sale of real estate.   48 Ark. 557, 565; 15 *Id.* 680.   A lease is a chattel.   But if real estate a recovery could be had, notwithstanding no license was procured.   89 Ark. 209; 145 U. S. 421; 60 Ark. 473.

6.   The agreement was not within the statute of frauds.   Kirby's Digest, § 2654; 48 Ark. 557; 60 *Id.* 473; 103 *Id.* 175; 39 W. Va. 231; 68 Oh. St. 259.   Oil and gas leases convey no interest in land.

7.   There is no error in the instructions.   The verdict is sustained by the evidence and is right on the whole case.

STATEMENT BY THE COURT.

W. F. Blocker and J. A. Brake sued Frank Engles to recover commissions alleged to be due them for disposing of certain leases on real estate for him.   The material facts are as follows:

Frank Engles secured oil and gas leases on 14,000 acres of land in Crawford county, Arkansas.   For lack of money he could not drill for oil or gas and entered into negotiations with W. F. Blocker for a sale or other disposal of his leases.   Engles turned over the leases to

Blocker for that purpose. On June 27, 1914, Engles wrote to Blocker to send him the leases to his residence at Sapulpa, Oklahoma, because he had a party there who wanted to look them over. In the letter he promised to mail them back to Blocker after he was through with them. Blocker resided at Ft. Smith and sent the leases to Engles at Sapulpa, as requested. At the same time he informed Engles of a proposition to take over his leases which he had secured for him. In response to this letter, on July 4, 1914, Engles wrote to Blocker the following:

"Dear Sir: Yours at hand and will say that if those parties will go ahead and drill a well I will only be too glad to go in with them as I have a great feeling for old Arkansas and my friends down there, and I have spent more money trying to get development in that country than any other man that has ever taken hold of this proposition, and I will still do anything that is reasonable to promote this deal; now if your parties will put one test well down to the depth of 2,500 feet I will give them 12,000 acres in the company, and retain one-sixth interest in the company and the first well and after this first well will pay my share on all other wells.

"Now if they have decided to drill and want to act on this proposition I am ready to assign to them that amount to the company and I will lend them all the help I possibly can, but I do not want any more jaw bone as that will not drill oil wells. This is the best time to develop down there as everything has shut down here for four months. Please advise me at once as these parties here are making up a company to drill down there, and it is the first one in that will make his jack. Let me hear from you at once."

Blocker answered this letter on July 7, 1914, as follows:

"Dear Sir: Yours received this morning, and I have seen the other parties and closed a deal with them as follows: You are to put in 8,000 acres of your leases into the company against their 8,000 acres; you are to own

a one-sixth interest in the company. They are to furnish the money to do the drilling. They agree to spend the sum of $15,000 in drilling, which amount they have already subscribed. They are to begin drilling within ninety days from the organization of the company, which is to be known as the Clear Creek Oil & Gas Company. They are to have a meeting for permanent organization as soon as this deal is finally closed with you, and will give you notice of same so that you can either be here in person, or by representative here with proxy.

"We have saved you in this deal 4,000 acres of leases and the sixth of the cost of any wells they may drill after the first one. As you offered to do in your last letter; this has saved you in cash not less than from $1,600 to $2,000. In view of this fact I think it not more than fair that you agree to assign an interest in the remaining leases to Mr. Brake and myself and to pay us in cash $500.00. When the deal is finally closed and you have signed contract from these people to do as I have stated to you.

"Send me the leases at once so we can select from them 8,000 acres and hold out the others properly located. I would suggest that you let us close this deal and represent you in the formation of the company, as I am sure that we can handle this situation for you to better advantage. You will be fully protected by this letter and the fact that you do not assign the leases until the company is organized and you are assigned a one-sixth interest in it, and until you receive an agreement in writing as to what they agree to do. If the above is agreeable to you forward the leases at once as these people are anxious to get ready to drill. They will have an expert geologist to report on this field at once."

On July 9, 1914, Engles wrote to Blocker the following:

"Dear Sir:—Yours at hand and I will say that I will accept the proposition of the first parties to which I will give them 8,000 acres and own one-sixth interest

and they to do as you say they have agreed to do—spend $15,000 in drilling three wells or two wells. Mr. Blocker, as far as you and Mr. Brake are concerned, you propose that I divide the remainder 4,000 acres. Yes, that is fair. I will give each of you one-third of the remainder. Let it be whatever it will, 6,000 or more, or less, but as far as the $500 is concerned I will take that and assign you the whole 12,000 acres and step out now if this proposition suits you. Say so, and you shall have the assignment in the next five days if you had or could convince me where there is any $500 coming I might do it, but I can't see now. Don't you think my proposition is more reasonable than yours, and I will do this just as I write you.

"Let me hear from you at once."

Blocker replied to that letter under date of July 11th, as follows:

"Dear Sir:—Yours received dated 9th inst. and noted. In reply I want to urge you to close up the deal with those parties with the 8,000 acres without delay, as some of the people who have helped you get these leases are threatening to have written notice served on you of the cancellation of the leases as the leases provide. We have been holding them off and I don't know how much longer we can do so.

"In regard to Mr. Brake and myself, your proposition to divide the balance one-third each is fair enough. In your former letter you offered to pay your one-sixth part of the cost of each well drilled after the first one. In making the trade with these people here I have saved you that cost and expense and I thought you would be willing to give us a percentage on the amount you would be saved.

"In regard to the 8,000 acres for these people here, I would like for you to send the leases at once so that I can select from them the leases on the lands, beginning with the London's and running south and east of Alma, which I think is the best, and these leases we can hold for ourselves. We have another party on the string that will agree to drill by the first of September coming

if we can get him one thousand acres, but we will have to get new leases for him as he does not like the contract in yours. I want to urge you to not delay in getting these matters finally closed up. Send the leases over. We can put them in escrow in the bank here, and get the contract signed up with these people as to what they will do and showing your interest in the company. This contract will be sent you and if as agreed upon, you can sign it, keeping one copy of it and then assign them the 8,000 acres to go into the company. Mr. Keller is still working with Wright and McGee, getting leases on the lands covered by yours in a number of instances."

Engles went to Ft. Smith and sold his leases on the whole 14,000 acres to the Clear Creek Oil & Gas Company for $2,500 worth of stock in that corporation. Blocker did not know anything about this transaction until after it had been done. After he learned of the contract between Engles and the Clear Creek Oil & Gas Company, he wrote to Engles under the date of July 28, 1914, as follows:

"Dear Sir:—The deal having been closed up between you and the Clear Creek Oil & Gas Company as per your instructions, it is in order that we carry out the agreement with Mr. Brake and myself for handling the matter for you, as per your letter of the 9th inst.

"Kindly execute an assignment of one-third interest in the remaining six thousand acres to Mr. Brake and one-third to myself. If this is done at once I think we can interest another party we have on hand and make it doubly sure of getting the acreage drilled.

"Kindly attend to this at once and let me hear from you."

Other evidence will be stated or referred to in the opinion.

The jury returned a verdict for the plaintiff in the sum of $614.28 and the evidence tended to show that the leases which the defendant had transferred in violation of the agreement with plaintiffs were worth that sum. To reverse the judgment rendered, the defendant prosecutes this appeal.

HART, J. (after stating the facts).

(1-2) The court instructed the jury that the letters read in evidence constituted a contract between the plaintiffs and defendant and the action of the court in so ruling is assigned as error calling for a reversal of the judgment. Ordinarily it is the duty of the court in the trial of cases to construe a written contract and declare its terms and meaning to the jury. In the instant case the terms of the contract were evidenced by the letters set out in the statement of facts and it was the duty of the court to construe the contract and declare its terms to the jury. The reason is that the letters which constituted the contract did not contain any words of latent ambiguity and show in express terms that Engles agreed to give each of the plaintiffs one-third of the remainder of his leases whether that amounted to 6,000 acres more or less, after he had transferred to the Gas & Oil Company the leases on 8,000 acres. *Mann* v. *Urquhart*, 89 Ark. 239; *Paepcke-Leicht Lbr. Co.* v. *Talley*, 106 Ark. 400. In his letter of July 9, 1914, addressed to W. F. Blocker at Ft. Smith, he expressly so stated. Blocker received this letter and acted on it. On July 11, 1914, he wrote to Engles stating that he had received his letter of July 9th and that he accepted the proposition to divide the balance of the leases, giving a one-third interest therein to each of the plaintiffs after the leases for the 8,000 acres had been transferred to the Oil & Gas Company for stock in that corporation.

Counsel for the defendant also assigns as error the action of the court in refusing to permit him to introduce further testimony after the evidence had been closed and the witnesses in the case discharged. He wanted to show by the secretary of the Gas & Oil Company that Mr. Blocker told him that he did not want the stock in the corporation to be issued to the defendant, Engles, because Engles had not settled with him for his commissions and also offered to introduce a letter written to Robinson by Blocker as follows:

"Mr. Engles and myself have come to an understanding regarding the commissions due me."

(3-4)   Counsel for the defendant sets out at length the reason why he did not introduce this evidence before the case was closed but we do not deem it necessary to set it out in this statement.   If it be admitted that defendant was not negligent in not sooner informing his counsel of this testimony, still it was a matter of discretion with the court and we do not think that the court erred in refusing to reopen the case to let in this testimony. It is true the letter apparently contradicted the statement that Robinson said   Blocker had made to him, but the letter was open to explanation and when explained by Blocker, it might not have tended in any wise to have contradicted his purported statement to Robinson.   In any event the letters constituted the contract between the parties in regard to the commissions due Blocker, and the offered testimony could not have changed their effect.   It is contended that the court erred in admitting the testimony of Blocker and others as to what Engles received in stock, and what it was worth.   It will be remembered that Engles transferred all his leases amounting to about 14,000 acres to the Gas & Oil Company and received therefor $2,500 in the stock of the corporation.   Under the contract as evidenced by the letters the plaintiffs were to receive a one-third interest each in the leases remaining after transferring leases for 8,000 acres to the Gas & Oil Company.   The court instructed the jury that if it should find from the evidence that the defendant had disposed of the leases in violation of his agreement with the plaintiffs, that the plaintiffs would be entitled to recover from the defendant the fair and reasonable market value of said leases at the time so disposed of by the defendant which he had agreed to assign to the plaintiffs.   The leases to the whole 14,000 acres were situated in the same gas and oil territory and the amount for which the defendant sold and transferred these leases was evidence tending to show their market value. He received for their sale and transfer a certain amount

of stock in a corporation organized for the development of these and other gas and oil lands in the same territory. Under these circumstances we do not think the court erred in admitting the testimony.

(5) It is also insisted that the court erred in admitting the carbon copies of the letters written by Blocker which were set out in the statement of facts. We do not think the court erred in admitting these letters in evidence. Blocker testified that they were mailed to Engles and the letters written by Engles to Blocker show that each of these letters except one dated July 11, 1914, and that of the date of July 28, 1914, were received by Engles. The record also shows that Blocker wrote Engles a letter notifying him of the formation of the oil and gas corporation and did not keep a copy of it. His counsel asked Engles to produce the copy of this letter. Engles denied having received the letter but admitted that he had received all the other letters written to him by Blocker. We think that a carbon copy of the letter addressed to an adversary in a law suit is admissible in evidence without making any effort to require the adverse party to produce the letter received by him. In this respect there is a distinction between letter press copies and instruments produced by carbon paper. What is called the carbon copy is produced by placing a sheet of carbon paper between two sheets of letter paper so that the same impression produces both the letter and the carbon copy. Because the carbon copy is made at the same time by the same impression it may be regarded as. a duplicate of the original letter itself and admitted in evidence without notice to produce the letter. *International Harvester Co.* v. *Elfstrom*, 101 Minn. 263, 11 A. & E. Ann. Cas. 107, 12 L. R. A. (N. S.) 343; *Chesapeake & Ohio Ry. Co.* v. *F. W. Stock & Sons*, 51 S. E. (Va.) 161; *Cole* v. *Ellwood Power Co.*, 65 Atl. (Penn.) 678.

(6) The letters signed by Blocker of which copies were kept, were mailed to Engles as the evidence of their understanding and Engles admits that he received them. There seems to be no good reason for Blocker, when

he is seeking to enforce their obligation, to ask for the production of the letters received by Engles. If proof of the duplicate was important to Engles, he was at liberty to make use of it and could have introduced the letter received by him to show that the carbon copy was not a duplicate of it. Inasmuch as he did not do so, it is to be presumed that the carbon copy introduced by Blocker was a duplicate of the original letter received by him.

(7) It is also insisted that the court erred in excluding proof that Blocker has no license as a broker to deal in real estate in the city of Ft. Smith. In the first place Blocker was not a real estate broker. He was engaged in other business and this was a single transaction by him. Moreover the provision of the ordinance referred to did not provide that contracts made by real estate brokers without a license should be void. Provisions of the ordinance neither directly nor indirectly refer to any consequences save the payment of a fine for not taking out a license. The purpose of the ordinance was to impose a license tax upon real estate brokers and not to invalidate contracts. The ordinance neither by its manifest intent nor in express terms declares that any contract made by a broker without a license should be invalid. The ordinance in question does not prevent the recovery on a contract made without having procured a license. *Stiewel* v. *Lally*, 89 Ark. 195; *Hodges* v. *Bayley*, 102 Ark. 200.

Counsel complains that the court erred in giving instructions in favor of the plaintiffs and in refusing instructions asked by the defendant. We do not deem it necessary to set out these instructions. The court instructed the jury according to the principles of law above announced.

Counsel for the defendant also contends that the court erred in excluding the evidence of the defendant to the effect that he never agreed to the terms of Blocker's letter of July 11th. He relies on the case of *Allen* v. *Nothern*, 121 Ark. 150. In that case there was never a meeting of the minds of the parties as shown by

the letters.    Here the facts are essentially different, as we have already pointed out.

(8)    On July 7, 1914, Blocker wrote to Engles about transferring the leases on 8,000 acres to the Oil & Gas Company and for his commissions proposed that Engles should assign an interest in the remaining leases to plaintiffs and pay them in cash $500.00.    On July 9, 1914, Engles answered this letter and proposed to give each of the plaintiffs one-third of the remainder of the leases after transferring leases to the amount of 8,000 acres to the Oil & Gas Company, but he refused to pay them the $500 in cash.    He proposed to make the assignment in the next five days, and further told Blocker that if he could convince him that there was any $500 coming to him that he might give him that, and wound up his letter with the following:    "Don't you think my proposition is more reasonable than yours and I will do this just as I write you.    Let me hear from you at once."

On July 11, 1914, Blocker answered this letter and said, in regard to Mr. Brake and myself your proposition to divide the balance one-third each is fair enough. The contract showed that he referred to a transfer of the leases remaining. after leases to the amount of 8,000 acres had been transferred to the Oil & Gas Company.    This was an unqualified acceptance of Engles' offer and constituted a binding contract between the parties.

It is also contended that the court erred in excluding the evidence of J. H. Keller to the effect that he, Keller, was the moving cause that brought Engles and the Gas & Oil Company together.    We do not think the court erred in excluding this evidence.    As we have just seen a binding contract was entered into between the parties as shown by the letters which passed between them.

Finally it is insisted that the agreement between the parties is in contravention of the statute of frauds.    On this point we need only say that if we are correct in holding that the letters constituted a binding obligation

between the parties, the statute of frauds is not available as a defense to the action.

We have carefully examined the record and find no prejudicial errors in it. Therefore, the judgment will be affirmed.